**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-

TOM'S URBAN MASTER LLC

Plaintiff,

v.

FEDERAL INSURANCE COMPANY,

Defendant.

---

**COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT,**
**BAD FAITH, AND STATUTORY DAMAGES**

---

## NATURE OF THE ACTION

1.     Plaintiff Tom's Urban Master LLC ("Tom's" or "Plaintiff"), which owns and operates four high-end sports bar and restaurant establishments in four different states, brings this insurance recovery action against Federal Insurance Company ("Chubb"[1]) based on Chubb's wrongful denial of Business Income and other types of insurance coverage relating to the COVID-19 pandemic.

2.     When Chubb wrongfully denied coverage to Tom's, it failed to recognize that Tom's claim is different than many of the COVID-19 Business Income claims submitted by policyholders across the United States, because (a) the insured property is defined to include a 1,000 foot radius for purposes of determining whether there has been "direct physical loss or damage" to the insured property, (b) there are instances of COVID-19 and the coronavirus within

---

[1] Federal Insurance Company is part of the Chubb Group of Insurance Companies, and it has communicated with Tom's relating to this matter on Chubb letterhead and refers to itself as "Chubb." *See* Exhibits B and E.

the insured premises, including the 1,000 foot radius, and (c) unlike many Business Income policies, Tom's policy has no virus exclusion.

3.     The absence of a virus exclusion in Tom's policy is significant for purposes of this action.  Chubb added a virus exclusion to many of the policies that it sold to other businesses, which were written on standard policy forms whose material provisions are similar or identical to the wording in Tom's policy.  If the standard wording of Chubb policies did not provide coverage for the scenario at hand – *i.e.*, the presence of a deadly, easily-spread virus within the property itself or within the 1,000 foot radius, forcing the closure of the business, and rendering the premises unusable -- then adding an exclusion for this scenario to certain policies would not have been redundant and unnecessary.  The addition of a virus exclusion to *other* policies, written on the same forms as Tom's policy, demonstrates that Tom's policy, with no such exclusion, *does* provide coverage.

4.     Despite these facts, Chubb denied Tom's claim as part of what appears to be a corporate level decision to deny COVID-19 Business Income claims across the board.  On information and belief, Chubb has denied all COVID-19 Business Income claims under policies written on the same forms as Tom's, whether those policies contain a virus exclusion or not.  By failing to consider the specific facts, policy wording, and applicable state law affecting Tom's claim, Chubb breached its contract with Tom's and acted in bad faith.  This action seeks the full blanket limits available under the applicable insurance policy, $6,014,798, plus a penalty of twice that amount, and Tom's attorneys' fees, as required by Colorado Revised Statutes §§ 10-3-1115 and 1116, plus further damages to be proven at trial.

## PARTIES, JURISDICTION, AND VENUE

5.     Plaintiff Tom's Urban Master LLC is a Delaware limited liability company with its principal place of business in Denver, Colorado.

6.     Defendant Federal Insurance Company is an Indiana corporation with its principal place of business in Whitehouse Station, New Jersey.  Defendant Federal Insurance Company is a subsidiary or affiliate of The Chubb Corporation d/b/a Chubb Group of Insurance Companies.

7.     At all relevant times Chubb was conducting business in Colorado.  According to its web page, Chubb maintains a regional office in Denver.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1332 because there is complete diversity of citizenship between Tom's and Chubb and the amount in controversy is greater than $75,000.

9.     Venue is proper in this district pursuant to 28 U.S.C § 1391(b)2 because a substantial part of the acts or omissions giving rise to the claims asserted occurred in this district.

## TOM'S URBAN WATCH BARS

10.     Tom's owns and operates four sports-themed bars and restaurants in four different cities, all of which provide multiple high-definition television screens, a wide selection of craft beers, unique specialty cocktails, and an eclectic menu of "street foods" from around the world.  Tom's establishments in large part depend on watching televised sports.

11.     In keeping with their urban, sports-centered theme, all four establishments are located in densely-populated, heavily-trafficked areas: downtown Los Angeles; the Las Vegas strip; and two Native-American owned gambling casinos.  Many thousands of

3

individuals pass through the 1,000-foot radius of the four establishments every day, as explained further below.

12.     Tom's Watch Bar Los Angeles is located at 1011 South Figueroa Street, Los Angeles, within the massive entertainment complex known as L.A. Live, with multiple hotels, restaurants, bars, and dense foot traffic.  Tom's also is adjacent to the Staples Center, a multi-purpose arena with seating capacity of approximately 20,000, the home court of the Los Angeles Lakers and the Los Angeles Clippers, and the venue for concerts and similar events.  According to internet mapping sites, Tom's Watch Bar Los Angeles is approximately 0.1 miles from Staples Center, and the 1,000-foot radius extends approximately 0.19 miles, so Staples Center is within the 1,000-foot radius.

13.     Tom's Urban Las Vegas is located at 3790 S. Las Vegas Boulevard, Las Vegas, and is part of the massive New York, New York hotel and casino complex.  The 1,000-foot radius surrounding Tom's venue contains the hotel's 2,000 guest rooms, plus many New York themed attractions, including a 300-foot replica of the Brooklyn Bridge. Other hotels and casinos are immediately adjacent on both sides.  Of the 49 million annual visitors to Las Vegas, the majority visit New York, New York to walk across the Brooklyn Bridge and to see its other unique attractions.

14.     Tom's Urban Mohegan Sun is included within the Mohegan Sun Casino & Resort, 1 Mohegan Sun Boulevard, Uncasville, CT.  Tom's is located immediately adjacent to the box office of the Mohegan Sun Arena, a 12,000 seat venue that is the home of the WNBA Connecticut Sun and the National Lacrosse League New England Black Wolves, and has hosted NBA exhibition games, concerts, and other events, all within the 1,000-foot radius of the insured premises.

15.     Tom's Urban Ilani is part of the Ilani Casino Resort located at 1 Cowlitz Way, Ridgefield, WA.  Ilani is the largest and best-known gaming facility in Washington state, containing fifteen restaurants and bars, and a 2,500-seat venue, all within 1,000 feet of the insured premises.

### THE COVID-19 PANDEMIC AND THE SPREAD OF CORONAVIRUS

16.     COVID-19 is an infectious disease caused by a virus, known as the "novel coronavirus" or Sars-CoV-2 (hereinafter "coronavirus"), originating in Wuhan, China in late 2019.  It is believed that the first instance of the disease spreading to humans was in or around December 2019.

17.     In January 2020, this virus and the resulting disease COVID-19 reached the United States and quickly spread around the country.  As early as February 26, 2020, the Center for Disease Control and Prevention ("CDC") advised that COVID-19 was spreading freely without the ability to trace the origin of new infections, also known as community transmission.

18.     On March 11, 2020, the World Health Organization ("WHO") declared COVID-19 to be a pandemic.

19.     As more and more people become infected by coronavirus, the number of infected people rises exponentially.

20.     According to the Johns Hopkins University and Medicine Coronavirus Resource Center, as of November 17, 2020, there are more than 55 million confirmed cases of COVID-19 worldwide.

21.     According to the CDC web page, as of November 17, 2020, there are more than 11.2 million confirmed cases of COVID-19 cases in the United States.

22.     As of November 17, 2020, there are more than 1,029,000 confirmed cases of COVID-19 in California, more than any state.

23.     As of November 17, 2020, there are more than 122,000 confirmed cases of COVID-19 in Nevada.

24.     As of November 17, 2020, there are more than 131,000 confirmed cases of COVID-19 in Washington state.

25.     As of November 17, 2020, there are more than 93,000 confirmed cases of COVID-19 in Connecticut.

26.     As of today, there is no treatment or vaccine for COVID-19.

## THE CLOSURE ORDERS AFFECTING TOM'S ESTABLISHMENTS

27.     State and municipal governments across the nation recognized the unprecedented and dangerous situation, with local governments and most or all states – including California, Nevada, Washington, and Connecticut – suspending operations of businesses where people could contract COVID-19 or spread it to others.  Examples of those closure orders and their effects on Tom's establishments are described in the following paragraphs.

28.     Tom's Watch Bar Los Angeles location was forced to close on or about March 16, 2020, due to civil orders by authorities with jurisdiction over this venue.  These include an order effective March 16, 2020 by Los Angeles Mayor Eric Garcetti closing bars, nightclubs, and restaurants within the city; an order of the California Department of Public Health, also effective March 16, 2020, directing all restaurants in the state to close; and, Governor Gavin Newsome's Stay at Home Order, Executive Order N-33-20, March 19, 2020.  These orders all are based on determinations that the presence of coronavirus and

COVID-19 made it impossible for businesses affected by the orders – including Tom's Watch Bar Los Angeles – to operate safely.  These orders, and the additional orders involving Tom's other three establishments as described below, are available at https://web.csg.org/covid19/executive-orders/, last visited November 17, 2020.  Tom's Watch Bar Los Angeles remains closed to this day.  As a result of this impairment of its operations, Tom's Watch Bar Los Angeles has lost substantial revenue.

29.     Tom's Urban Las Vegas location was closed on or about March 17, 2020, along with the entire New York, New York complex, as required by orders of the Governor of Nevada, Stephen Sisolak.  These orders include Declaration of Emergency Directive 002, dated March 18, 2020, ordering closure of gaming establishments, and the Declaration of Emergency Directive 003, March 20, 2020, ordering closure of all non-essential businesses.  Both orders are predicated on the determination by state authorities that the coronavirus is present wherever there are large crowds, and that the presence of the virus rendered the insured property too dangerous to utilize for its intended purpose.  Tom's Las Vegas location re-opened on or about June 4, 2020. As a result of this impairment of its operations, Tom's Urban Las Vegas lost substantial revenue.

30.     Tom's Urban Mohegan Sun in Uncasville, Connecticut was closed along with the entire Mohegan Sun Complex on or about March 16, 2020.  The closure was pursuant to Executive Order No. 7D of Governor Ned Lamont, dated March 16, 2020, Protection of Public Health and Safety During COVID-19 Pandemic and Response – Crowd Reduction and Social Distancing.  This establishment re-opened on or about August 26, 2020.  As a result of this impairment of its operations, Tom's Urban Mohegan Sun has lost substantial in revenue.

31.     Tom's Urban Ilani was forced to close on or about March 16, 2020, along with the Ilani Casino Resort as a whole, pursuant to Proclamation 20-13 of the Governor of Washington, dated March 16, 2020. This establishment re-opened on or about July 16, 2020. As a result of this impairment of its operations, Tom's Urban Ilani has lost substantial revenue.

## THE CHUBB POLICY

32.     Federal Insurance Company, a Chubb company, sold LLC Policy No. 3604-12-38 WCE ("Policy") to Tom's Urban Master.  The Policy, which Chubb refers to as the "Customarq Classic Insurance Program," has a policy period of June 10, 2019 to June 10, 2020, both days 12:01 AM at the Named Insured's address.  The Named Insured's address is Tom's Urban Master, LLC, 3900 E. Mexico Avenue, Suite 1200, Denver, CO 80210.  A copy of the Policy is attached as Exhibit A, and is incorporated by reference in its entirety.

33.     The Policy provides coverage to all four of the Tom's establishments described above – Tom's Watch Bar Los Angeles, Tom's Urban Las Vegas, Tom's Urban Mohegan Sun, and Tom's Urban Ilani.  The premises of all four establishments are listed in the Declarations as covered premises under the Policy.

34.     The Policy is an All-risk policy, meaning that it covers damage to property and lost income from all types of risks unless they are specifically excluded.

35.     The Policy provides protection against loss or damage to covered property itself, and also replaces lost income when business operations are suspended or interrupted because of direct physical loss or damage to covered property.  This latter coverage, commonly known as "business income" or "business interruption" coverage, is standard in commercial property policies such as the Policy sold by Chubb to Tom's.  The Section of the Policy titled Business

Income with Extra Expense contains several types of coverage that apply to replace the revenue lost at each of the four Tom's establishments due to the COVID-19 pandemic.

36.    The Policy provides a Blanket Limit of $6,014,789 for Business Income with Extra Expense. It also provides an additional Blanket Limit of $150,006 for BI (Business Income) Prep of Loss Fees, to defray Tom's costs and fees of submitting its claim to Chubb.

37.    The coverages relevant to this lawsuit are contained in the section of the Policy entitled "Business Income With Extra Expense," which in turn is split into two sub-sections, entitled "Premises Coverages" and "Additional Coverages."

38.    All of the Premises Coverages are governed by a prefatory clause stating that these coverages are triggered not just by direct physical loss or damage to the actual premises shown in the Declarations, but also by direct physical loss or damage within 1,000 feet of those premises:

> **Premises Coverages**    The following Premises Coverages apply only at those premises for which a Limit Of Insurance applicable to such coverages is shown in the Declarations.
>
> Except as otherwise provided, direct physical loss or damage must:
>
> - be caused by or result from a **covered peril**; and
> - occur at, or within 1,000 feet of, the premises, other than a **dependent business premises**, shown in the Declarations.

39.    In other words, if lightning strikes 900 feet from an insured location and the ensuing damage causes the insured business to lose income, that lost income qualifies as "Business Income" for purposes of coverage under the Policy. This 1,000-foot extension of the insured premises for purposes of "Business Income" coverage is separate and independent from the Ingress and Egress and Civil Authority coverages, described below, that both include a one-mile radius as part of their respective grants of protection.

40.    The following paragraphs highlight certain types of coverage provided by the Policy that contractually obligate Chubb to pay the losses incurred by Tom's that are described

herein.  These coverages are not mutually exclusive, and seeking recovery for certain losses under one type of coverage does not preclude recovery of other losses under other coverages. Tom's claims against Chubb in this action rely on the Policy as a whole, and by highlighting certain provisions, Tom's does not intend to curtail or limit its claims in any way.

### Business Income and Extra Expense

41.     As one of the Premises Coverages under the Policy, Chubb promises to pay for the actual Business Income loss and Extra Expense that Tom's incurs due to the impairment of its operations, caused by "direct physical loss or damage" to the insured property:

| | |
|---|---|
| *Business Income And Extra Expense* | We will pay for the actual:<br>• **business income** loss you incur due to the actual impairment of your **operations**; and<br>• **extra expense** you incur due to the actual or potential impairment of your **operations**,<br>during the **period of restoration**, not to exceed the applicable Limit Of Insurance for Business Income With Extra Expense shown in the Declarations.<br>This actual or potential impairment of **operations** must be caused by or result from direct physical loss or damage by a **covered peril** to **property**, unless otherwise stated.<br>This Premises Coverage applies only at those premises:<br>• where you incur a **business income** loss or **extra expense**; and<br>• for which a Limit Of Insurance for Business Income With Extra Expense is shown in the Declarations.<br>If a Limit Of Insurance for Business Income With Extra Expense is shown as applicable to a premises in the Declarations, such limit reflects your total Limit Of Insurance at that premises and the Limit Of Insurance for Extra Expense shown in the Supplementary Declarations – Property does not apply. |

42.     Each of the bolded terms included within the Business Income and Extra Expense coverage are defined in the Policy, and those definitions are incorporated herein by reference.

43.     All of the elements of "Business Income" loss and of "Extra Expense" are satisfied by some or all of the losses suffered by Tom's and described herein.

44.     The "Period of Restoration" began on or about the date when Tom's was ordered to close down each of its operations.

### Ingress And Egress

45.     As one of the Premises Coverages under the Policy, Chubb promises to pay for lost Business Income and Extra Expense that results when ingress and egress to the premises identified in the Declarations is prevented due to "direct physical loss or damage" to property within one mile of the insured premises:

| | |
|---|---|
| *Ingress And Egress* | We will pay for the actual: |

We will pay for the actual:

- **business income** loss you incur due to the actual impairment of your **operations**; and
- **extra expense** you incur due to the actual or potential impairment of your **operations**,

when existing ingress to or egress from a premises shown in the Declarations is prevented due to direct physical loss or damage by a **covered peril** to property, provided such property is within:

- one mile; or
- the applicable miles shown in the Declarations,

from such premises, whichever is greater.

This Premises Coverage will begin at the time of direct physical loss or damage and will continue until the expiration of 30 consecutive days thereafter or whenever your **business income** coverage ends, whichever occurs first.

This Premises Coverage does not apply if the:

- direct physical loss or damage is caused by or results from earthquake or **flood**; or
- ingress to or egress from your premises is prohibited by civil authority.

The most we will pay for this Premises Coverage is the applicable Limit Of Insurance for Ingress And Egress shown under Business Income in the Declarations.

46.     Each of the bolded terms included within the Ingress And Egress coverage are defined in the Policy, and those definitions are incorporated herein by reference.

47.     All of the elements of Ingress and Egress are satisfied by some or all of the losses suffered by Tom's and described herein.

*Civil Authority*

48.     As one of the Additional Coverages under the Policy, Chubb promises to pay for Business Income and Extra Expense that are lost when access to the insured premises is prohibited by an order of a Civil Authority:

11

*Civil Authority*

We will pay for the actual:

- **business income** loss you incur due to the actual impairment of your **operations**; and
- **extra expense** you incur due to the actual or potential impairment of your **operations**,

directly caused by the prohibition of access to:

- your premises; or
- a **dependent business premises**,

by a civil authority.

This prohibition of access by a civil authority must be the direct result of direct physical loss or damage to property away from such premises or such **dependent business premises** by a **covered peril**, provided such property is within:

- one mile; or
- the applicable miles shown in the Declarations,

from such premises or **dependent business premises**, whichever is greater.

---

## *Additional Coverages*

*Civil Authority*
*(continued)*

The most we will pay for Civil Authority is the applicable Limit Of Insurance for Business Income With Extra Expense shown in the Declarations.

The coverage for:

A.   **business income** will begin:

    1.   after the applicable waiting period shown in the Declarations for Business Income expires; or

    2.   24 consecutive hours following the time the civil authority prohibits access,

whichever is the longer.

The Waiting Period shown in the Declarations will begin immediately following the time the civil authority prohibits access.

The coverage will apply for a period of:

- up to 30 consecutive days after coverage begins; or
- when your **business income** loss ends,

whichever occurs first; and

B.   **extra expense** will begin immediately after the time the civil authority prohibits access and will end:

    1.   30 consecutive days after the coverage begins; or

    2.   whenever your **business income** coverage ends,

whichever is later.

This Additional Coverage does not apply if the direct physical loss or damage is caused by or results from earthquake or **flood**.

49.     Each of the bolded terms included in the Civil Authority coverage are defined in the Policy, and those definitions are incorporated herein by reference.

12

50.     All of the elements of Civil Authority are satisfied by some or all of the losses suffered by Tom's and described herein.

51.     The orders of various civil authorities described earlier in this complaint qualify under any reasonable interpretation of the phrase "prohibition of access by a civil authority" – words that are not defined anywhere in the Policy – and therefore trigger Civil Authority coverage.

*Dependent Business Coverages*

52.     As one of the Additional Coverages under the Policy, Chubb promises to pay for Business Income lost and Extra Expenses incurred when there is "direct, physical loss or damage" to a Dependent Business Premises:

| *Dependent Business Premises* | We will pay for the actual: |
|---|---|
| | • **business income** loss you incur due to the actual impairment of your **operations**; and |
| | • **extra expense** you incur due to the actual or potential impairment of your **operations**, during the **period of restoration**, not to exceed the applicable Limit Of Insurance for Dependent Business Premises shown under Business Income in the Declarations. |
| | This actual or potential impairment of **operations** must be caused by or result from direct physical loss or damage by a **covered peril** to **property** or **personal property of a dependent business premises** at a **dependent business premises**. |
| | You may purchase higher limits for specific **dependent business premises** only by showing such premises in the Declarations. Such higher limits apply to actual **business income** loss or **extra expense** only if the covered direct physical loss or damage occurs at such **dependent business premises**. |
| | This Additional Coverage does not apply if the direct physical loss or damage is caused by or results from earthquake or **flood**. |

53.     Each of the bolded terms included in the Dependent Business Premises coverage are defined in the Policy, and those definitions are incorporated herein by reference.

54.     The term Dependent Business Premises itself is defined as follows:

| Dependent Business Premises | **Dependent business premises** means premises operated by a person or organization other than you on whom: |
|---|---|

- you; or
- others,

depend to:

- deliver materials or services to you or to others for your account (contributing premises);
- accept your products or services (recipient premises);
- manufacture products for delivery to you or your customers under contract of sale (manufacturing premises); or
- attract customers to your business (leader premises).

**Dependent business premises** does not mean any:

A. premises operated by others on whom you or others depend to:

   1. deliver utility services to you; or

   2. accept utility services from you; or

B. premises of **on-line access** providers.

55.     All of the elements of Dependent Business Premises coverage are satisfied by some or all of the losses suffered by Tom's and described herein.

56.     Three of Tom's insured locations (Tom's Urban Mohegan Sun, Tom's Urban Ilani, and Tom's Urban Las Vegas) are part of casino and hotel complexes, and Tom's depends on those venues to attract customers to its own establishments.  The fourth location (Tom's Urban Watch Bar Los Angeles) is part of LA Live, a massive complex of hotels, restaurants, bars, and entertainment venues, that Tom's depends on to attract customers to its own establishment.  All of these Dependent Business Premises suffered "direct physical loss or damage" that required them to close, and that in turn, caused Tom's to incur covered losses.

57.     The COVID-19 pandemic not only caused Tom's establishments and surrounding venues to close, it also caused the most significant disruption to the worldwide sports calendar since World War II.  As just one example, the 2020 Summer Olympic games scheduled for July 2020 in Tokyo were postponed to 2021, the first postpoment of Olympic competition in modern history.

58.     All of the sports that Tom's clientele would have gathered to watch in Tom's establishments beginning in mid-March 2020, and in the months that followed, were canceled or postponed.  This includes March Madness college basketball tournament, the National Hockey league regular season and playoffs, Major League Baseball, and the National Basketball Association regular season and playoffs.  The cancellation of the activities that customers gathered to watch in Tom's establishments caused Tom's to incur losses that are covered under the Policies.

*Prohibition of Access*

59.     As one of the Additional Coverages under the Policy, Chubb promises to pay for Business Income lost and Extra Expenses incurred when there is prohibition of access to a premises shown in the Declarations by a Civil Authority, but there is *not* any "direct physical loss or damage" to property:

| *Prohibition Of Access* | We will pay for the actual: |
|---|---|
| | • **business income** loss; and |
| | • **extra expense,** |
| | you incur due to the actual impairment of your **operations**, directly caused by the prohibition of access to a premises shown in the Declarations by a civil authority, subject to the applicable Limits Of Insurance for Prohibition Of Access. |
| | This prohibition of access must be the direct result of a peril (not otherwise excluded by the Building And Personal Property Contract included in this policy) that: |
| | A.    has occurred at or within 1,000 feet of such premises; or |
| | B.    is certain to occur imminently, provided: |
| |     1.    the geographic area where access is restricted is less than 5,000 square feet; or |
| |     2.    the prohibition of access only applies to such premises. |
| | The coverage will begin immediately following the time the civil authority prohibits access. The coverage will apply for a period of: |
| | • up to 30 consecutive days after the coverage begins; or |
| | • when your **business income** loss ends, |
| | whichever occurs first. |
| | This Additional Coverage does not apply: |
| | A.    if the prohibition of access is caused by or results from: |
| |     1.    direct physical loss or damage to property; |
| |     2.    weather conditions; or |
| |     3.    earthquake or **flood**; or |

*Additional Coverages*

| *Prohibition Of Access* | B. | to **business income** loss, unless a Limit Of Insurance for Business Income is shown in the |
| *(continued)* | | Declarations applicable to the premises where prohibition of access occurred. |

60.     Each of the bolded terms included in Prohibition of Access are defined in the Policy, and those definitions are incorporated herein by reference.

61.     On information and belief, Chubb will assert that the COVID-19 pandemic, the presence of coronavirus on property, and the ensuing closure orders do not constitute "direct physical loss or damage to property."  In the following section, Tom's demonstrates that Chubb is incorrect and that there is "direct physical loss or damage to property."  However, in the alternative, if the Court should reject Tom's position and agree with Chubb that there has been no such loss or damage, then Tom's would be entitled to coverage for its losses under the Prohibition of Access coverage.

## THERE HAS BEEN "DIRECT PHYSICAL LOSS OR DAMAGE TO PROPERTY"

62.     The Policy wording of the coverages provided by the Policy that Tom's is seeking to enforce, except Prohibition of Access, refer to "direct physical loss or damage to property."

63.     Those words are not defined anywhere in the Policy, and the Policy was drafted by Chubb without input or negotiation by Tom's over the wording. Therefore, if the facts of a loss meet any reasonable interpretation of those words, then there has been "direct physical loss or damage" to the insured property.

64.     Both of the words "loss" and "damage" must be given their own distinct meaning. In the context of a restaurant, the word "loss" cannot mean misplaced, as one might lose a cell phone or sunglasses, so the only reasonable reading of the word "loss" in Tom's policy is the loss of use of property for its revenue-producing purpose.

65.     The four insured premises, including their 1,000-foot radius, have suffered "direct physical loss or damage to property" because a dangerous and potentially deadly substance, the novel coronavirus, has been unleashed in and around the premises, rendering the premises unfit and incapable of being used for their intended purpose, and causing multiple civil authorities to order their closure.

66.     When a person with COVID-19 coughs or sneezes, droplets containing the coronavirus are dispersed into the air and deposited on surfaces.  Often such people are asymptomatic yet spread the coronavirus to others.

67.     The coronavirus also can spread when an infected person touches their mouth, nose, or eyes, and then touches another person or surface.

68.     Infected droplets and particles carrying COVID-19, while not visible to the naked eye, are physical objects that travel to other objects and cause harm.

69.     There is no requirement in the Policy that "direct physical loss or damage" must be visible to the naked eye, nor that it must visibly alter the structure of property, in order to trigger Chubb's obligations.  To the contrary, in the case of COVID-19 related losses, the fact that the "direct physical loss or damage" is invisible to the naked eye, yet potentially deadly, is exactly what makes the property damage so difficult to contain and to manage, and therefore so costly in terms of business income losses.

70.     Surfaces on which COVID-19 has been shown to survive and transmit include stainless steel, copper, plastic, wood, paper, glass, ceramic, cardboard, cloth, and human skin.

71.     The coronavirus physically attaches to such surfaces and can stay alive for multiple days or weeks.  Any person who touches a surface containing the coronavirus, who

then touches his or her face, can become infected with the coronavirus and spread it to other people.   This makes property exposed to coronavirus unsafe, dangerous, and unsuitable for use.

72.     Any person who touches a surface containing the coronavirus can become infected.  Secondary exposure from surfaces to people is especially concerning where people gather to eat, drink, socialize, watch sports, and be entertained.

73.     The locations where Tom's establishments are located are densely-populated and heavily trafficked, and loaded with casinos, sports arenas, hotels, restaurants, bars, and similar establishments.  It is certain that many people carrying the coronavirus passed through Tom's restaurants and the 1,000-foot radius, depositing the deadly virus on the insured property.  This caused a consensus among the civil authorities, the management of the properties that control access to Tom's four establishments, and Tom's own management that the restaurants could not be operated safely and must be closed.

74.     There are publicly confirmed examples of positive COVID-19 tests within the bounds of the insured property under the Policy.  Multiple NBA basketball players tested positive for COVID-19, many of whom played in Staples Center, the home venue of the NBA teams Los Angeles Lakers and Los Angeles Clippers, shortly before their diagnoses.  It appears that the virus was passed between players on the same team and on opposing teams who played games in Staples Center shortly before the NBA season was curtailed in mid-March 2020.

75.     On March 19, 2020, the Los Angeles Lakers announced that two players, whom it declined to identify by name, tested positive for COVID-19.  The Lakers played in Staples Center on March 3, March 6, March 8, and March 10.

76.     On March 17, 2020, it was announced that four Brooklyn Nets, including Kevin Durant, tested positive, and the Nets played against the Lakers in Staples Center on March 10, 2020.

77.     The Philadelphia 76'ers announced on March 19, 2020 that three unidentified members of the party traveling with their team had tested positive, and the 76'ers played in Staples Center against the Clippers on March 1, and against the Lakers on March 3.

78.     The Boston Celtics' Marcus Smart tested positive on March 14, 2020, following a Feburary 23, 2020 game in Staples Center against the Lakers,  and an unidentified member of the Denver Nuggets tested positive, following a Feburary 28 Nuggets game in Staples Center against the Clippers.

79.     All of these individuals, plus many others who they undoubtedly infected, were within a 1,000 foot radius of Tom's Watch Bar in Los Angeles, which is immediately adjacent to the Staples Center, during the time they carried the coronavirus.  A mile consists of 5,280 feet, and 1,000 feet is approximately 0.19 miles.  The address of Tom's Watch Bar is 1011 South Figueroa Street, Los Angeles, and the address of Staples Center is 1111 South Figueroa Street, Los Angeles.  According to popular web mapping internet sites, the distance between Tom's location and the Staples Center is approximately 0.11 miles.  In discovery and at trial, Tom's will make similar showings with respect to the other three insured properties, relying on records from hotels, casinos, sports arenas, and other venues within the 1,000 foot radius of each of the four locations.

## CHUBB'S BASELESS DENIAL OF TOMS' CLAIM

80.     Through its broker, Tom's submitted timely notice to Chubb on or about March 16, 2020 of the losses described herein.

81.    On April 16, 2020 thirty-one (31) days later, Chubb wrote a letter acknowledging receipt of the Tom's notice and pledging an investigation, but taking no position as to whether or not Tom's losses are covered.  Chubb's letter identified four sections of the Policy that potentially apply – Business Income with Extra Expense; Ingress and Egress; Civil Authority; and, Dependent Business Premises.  Chubb's letter is attached as Exhibit B.

82.    Chubb's April 16, 2020 letter did not identify any exclusion(s) that Chubb was asserting might apply.

83.    Chub's April 16, 2020 letter conceded that the property at which "direct physical loss or damage" must happen in order to trigger Chubb's coverage includes not just the insured premises themselves, but a 1,000 foot radius around those premises.

84.    On June 14, 2020, Tom's wrote a detailed, nine-page, single-spaced letter explaining why Chubb owes coverage to to Tom's for the losses claimed.  The letter explained that the 1,000-foot radius surrounding the insured premises include some of the most densely populated and heavily trafficed areas in the nation, that individuals carrying the coronavirus were within that 1,000 foot zone, and that the crowds of individuals moving through those 1,000 foot zones are prime examples of why the various closure orders were issued.  The letter listed the NBA players who tested positive for COVID-19 as publicly-known examples of the many individuals carrying the coronovirus within the 1,000 foot radius of the insured premises. This letter is attached as Exhibit C.

85.    Tom's June 14, 2020 letter cited authority from the Colorado Supreme Court holding that when a civil authority orders a building closed due to a harmful condition, there has been "direct physical loss or damage," and therefore an insurer under a policy with the same operative policy wording as the Chubb policy must provide business income coverage.

86.     On June 20, 2020, in response to questions posed by Chubb in a telephone call, Tom's wrote a second letter to Chubb in support of its claim.  In this letter Tom's confirmed that it was completely denied access to all four establishments, and that none of the four establishments were able to provide carry-out, curbside, or delivery service. This letter is attached as Exhibit D.

87.     On June 29, 2020 Chubb sent a letter denying Tom's claim, purporting to be unaware of any "direct physical loss or damage" to the insured premises, or within any of the geographic ranges stated in the Policy.  The letter did not respond to the specific facts (such as the NBA players' positive tests) or the legal authority cited by Tom's.  A copy of this letter is attached as Exhibit E.

88.     The June 29, 2020 letter again conceded that the relevant boundary to trigger coverage includes the 1,000 foot radius, and did not state any investigation undertaken by Chubb to determine or estimate the number of individuals carrying the coronovirus within that area at the relative time.  The letter did not identify any visits to, or other investigations of, the insured premises or the 1,000 foot radius.

89.     The letter mentioned only one exclusion --  "Acts or Decisions" – and did not cite any other exclusions as even potentially applicable.

90.     All conditions to coverage have been either satisfied or waived.

## COUNT ONE – DECLARATORY JUDGMENT: BUSINESS INCOME AND EXTRA EXPENSE

91.     The allegations set forth above are incorporated by reference as though contained herein, and to the extent necessary, this count is pled in the alternative.

92.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and obligations of the parties to a dispute.

93.    The Policy is a contract under which Tom's paid substantial premiums in return for Chubb's promise to pay Tom's claims for losses covered by the Policy.

94.    An actual, justiciable controversy presently exists between Tom's and Chubb concerning the parties' rights and duties under the contract.  Tom's requested coverage for COVID-19 related losses as provided by the Policy.  Chubb responded with a letter denying coverage, framing the dispute for this Court to resolve.

95.    Chubb has breached the Policy in the following respects:

    a.   Tom's suffered losses covered by the Business Income and Extra Expense section of the Policy.

    b.   Chubb is obligated to pay those losses.

    c.   Chubb has failed and refused to pay Tom's for those losses.

96.    Tom's therefore seeks a declaration of the parties' rights and obligations under the Business Income section of the Policy and requests that the Court declare the conduct of Chubb unlawful and in material breach of the Policy.

## COUNT TWO – BREACH OF CONTRACT: BUSINESS INCOME

97.    The allegations set forth above are incorporated by reference as though contained herein, and to the extent necessary, this Count is pled in the alternative.

98.    Tom's purchased an All-risk property insurance policy, that promises to replace lost Business Income up to Policy limits, and with no virus exclusion.

99.    The Policy is a valid, enforceable contract between Tom's and Chubb.

100.    Tom's has performed all of its obligations under the Policy, and/or such obligations have been waived by Chubb.

101.   Tom's has sustained a loss under the Business Income coverage section in the Policy related to the COVID-19 pandemic and related state and local orders.

102.   Chubb has refused and failed to honor its obligations under the Policy to pay Tom's, in direct and deliberate breach of the Policy.

103.   As a direct and proximate result of Chubb's breach, Tom's has sustained damages in an amount to be determined at trial.

**COUNT THREE – DECLARATORY JUDGMENT: INGRESS AND EGRESS**

104.   The allegations set forth above are incorporated by reference as though contained herein, and to the extent necessary, this count is pled in the alternative.

105.   The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and obligations of the parties to a dispute.

106.   The Policy is a contract under which Tom's paid substantial premiums in return for Chubb's promise to pay Tom's claims for losses covered by the Policy.

107.   An actual, justiciable controversy presently exists between Tom's and Chubb concerning the parties' rights and duties under the contract.  Tom's requested coverage for COVID-19 related losses as provided by the Policy.  Chubb responded with a letter denying coverage, framing a dispute for this Court to resolve.

108.   Chubb has breached the Policy in the following respects:

      a.   Tom's suffered losses covered by the Business Income section of the Policy;

      b.   Chubb is obligated to pay those losses.

109.   Tom's therefore seeks a declaration of the parties' rights and obligations under the Ingress and Egress section of the Policy and requests that the Court declare the conduct of Chubb unlawful and in material breach of the Policy.

## COUNT FOUR – BREACH OF CONTRACT: INGRESS AND EGRESS

110.     The allegations set forth above are incorporated by reference as though contained herein, and to the extent necessary, this Count is pled in the alternative.

111.     Tom's purchased an All-risk property insurance policy, that provides Ingress and Egress coverage up to Policy limits, and with no virus exclusion.

112.     The Policy is a valid, enforceable contract between Tom's and Chubb.

113.     Tom's has performed all of its obligations under the Policy, and/or such obligations have been waived by Chubb.

114.     Tom's has sustained a loss under the Ingress and Egress coverage section in the Policy related to the COVID-19 pandemic and related state and local orders.

115.     Chubb has refused and failed to honor its obligations under the Policy to pay Tom's, in direct and deliberate breach of the Policy.

116.     As a direct and proximate result of Chubb's breach, Tom's has sustained damages in an amount to be determined at trial.

## COUNT FIVE – DECLARATORY JUDGMENT: CIVIL AUTHORITY

117.     The allegations set forth above are incorporated by reference as though contained herein, and to the extent necessary, this count is pled in the alternative.

118.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and obligations of the parties to a dispute.

119.     The Policy is a contract under which Tom's paid substantial premiums in return for Chubb's promise to pay Tom's claims for losses covered by the Policy.

120.     An actual, justiciable controversy presently exists between Tom's and Chubb concerning the parties' rights and duties under the contract.  Tom's requested coverage for

COVID-19 related losses as provided by the Policy.  Chubb responded with a letter denying coverage, framing a dispute for this Court to resolve.

121.    Chubb has breached the Policy in the following respects:

a.    Tom's suffered losses covered by the Civil Authority section of the Policy.

b.    Chubb is obligated to pay those losses.

c.    Chubb has failed or refused to pay for those losses.

122.    Tom's therefore seeks a declaration of the parties' rights and obligations under the Civil Authority section of the Policy and requests that the Court declare the conduct of Chubb unlawful and in material breach of the Policy.

## COUNT SIX – BREACH OF CONTRACT: CIVIL AUTHORITY

123.    The allegations set forth above are incorporated by reference as though contained herein, and to the extent necessary, this Count is pled in the alternative.

124.    Tom's purchased an All-risk property insurance policy, that provides Civil Authority coverage up to Policy limits, and with no virus exclusion.

125.    The Policy is a valid, enforceable contract between Tom's and Chubb.

126.    Tom's has performed all of its obligations under the Policy, and/or such obligations have been waived by Chubb.

127.    Tom's has sustained a loss under the Civil Authority coverage section in the Policy related to the COVID-19 pandemic and related state and local orders.

128.    Chubb has refused and failed to honor its obligations under the Policy to pay Tom's, in direct and deliberate breach of the Policy.

129.    As a direct and proximate result of Chubb's breach, Tom's has sustained damages in an amount to be determined at trial.

## <u>COUNT SEVEN – DECLARATORY JUDGMENT: DEPENDENT BUSINESS PREMISES</u>

130.    The allegations set forth above are incorporated by reference as though contained herein, and to the extent necessary, this count is pled in the alternative.

131.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and obligations of the parties to a dispute.

132.    The Policy is a contract under which Tom's paid substantial premiums in return for Chubb's promise to pay Tom's claims for losses covered by the Policy.

133.    An actual, justiciable controversy presently exists between Tom's and Chubb concerning the parties' rights and duties under the contract.  Tom's requested coverage for COVID-19 related losses as provided by the Policy.  Chubb responded with a letter denying coverage, framing a dispute for this Court to resolve.

134.    Chubb has breached the Policy in the following respects:

    a.   Tom's suffered losses covered by the Dependent Business Premises section of the Policy.

    b.   Chubb is obligated to pay those losses.

    c.   Chubb has failed and refused to pay Tom's for those losses.

135.    Tom's therefore seeks a declaration of the parties' rights and obligations under the Dependent Business Premises section of the Policy and requests that the Court declare the conduct of Chubb unlawful and in material breach of the Policy.

## <u>COUNT EIGHT – BREACH OF CONTRACT: DEPENDENT BUSINESS PREMISES</u>

136.    The allegations set forth above are incorporated by reference as though contained herein, and to the extent necessary, this Count is pled in the alternative.

137.    Tom's purchased an All-risk property insurance policy, that promises to provide Dependent Business Premises coverage up to Policy limits, and with no virus exclusion.

138.    The Policy is a valid, enforceable contract between Tom's and Chubb.

139.    Tom's has performed all of its obligations under the Policy, and/or such obligations have been waived by Chubb.

140.    Tom's has sustained a loss under the Dependent Business Premises coverage section in the Policy related to the COVID-19 pandemic and related state and local orders.

141.    Chubb has refused and failed to honor its obligations under the Policy to pay Tom's, in direct and deliberate breach of the Policy.

142.    As a direct and proximate result of Chubb's breach, Tom's has sustained damages in an amount to be determined at trial.

## COUNT NINE – DECLARATORY JUDGMENT: PROHIBITION OF ACCESS

143.    The allegations set forth above are incorporated by reference as though contained herein, and to the extent necessary, this count is pled in the alternative.

144.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and obligations of the parties to a dispute.

145.    The Policy is a contract under which Tom's paid substantial premiums in return for Chubb's promise to pay Tom's claims for losses covered by the Policy.

146.    An actual, justiciable controversy presently exists between Tom's and Chubb concerning the parties' rights and duties under the contract.  Tom's requested coverage for COVID-19 related losses as provided by the Policy.  Chubb responded with a letter denying coverage, framing a dispute for this Court to resolve.

147.    Chubb has breached the Policy in the following respects:

    a.   Tom's suffered losses covered by the Prohibition of Access section of the Policy.

    b.   Chubb is obligated to pay those losses.

    c.   Chubb has failed and refused to pay Tom's for those losses.

148.    Tom's therefore seeks a declaration of the parties' rights and obligations under the Prohibition of Access section of the Policy and requests that the Court declare the conduct of Chubb unlawful and in material breach of the Policy.

## COUNT TEN – BREACH OF CONTRACT: PROHIBITION OF ACCESS

149.    The allegations set forth above are incorporated by reference as though contained herein, and to the extent necessary, this Count is pled in the alternative.

150.    Tom's purchased an All-risk property insurance policy, that promises to provide Prohibition of Access coverage up to Policy limits, and with no virus exclusion.

151.    The Policy is a valid, enforceable contract between Tom's and Chubb.

152.    Tom's has performed all of its obligations under the Policy, and/or such obligations have been waived by Chubb.

153.    Tom's has sustained a loss under the Prohibition of Access coverage section in the Policy related to the COVID-19 pandemic and related state and local orders.

154.    Chubb has refused and failed to honor its obligations under the Policy to pay Tom's, in direct and deliberate breach of the Policy.

155.    As a direct and proximate result of Chubb's breach, Tom's has sustained damages in an amount to be determined at trial.

## COUNT ELEVEN – BAD FAITH BREACH OF INSURANCE CONTRACT

156.    The allegations set forth above are incorporated by reference as though contained herein.

157.    Every contract contains an implied covenant of good faith and fair dealing, and that duty is enhanced with respect to insurance policies due to the nature of the insurance relationship.  Chubb covenanted that it would deal with Tom's fairly and honestly, and do nothing to impair, hinder, or injure Tom's rights to the benefits provided by the Policy.

158.    Through the acts and omissions described in Tom's complaint, Chubb breached that covenant.  Chubb's analysis (or lack thereof), handling, and denial of Tom's claim fell below the applicable common law and industry standards of care, violated the duties of good faith and fair dealing, and constituted the tort of bad faith breach of insurance contract.

159.    Chubb's acts and omissions were unreasonable and Chubb knew them to be so, and/or Chubb acted with reckless disregard for Tom's rights and interests.

160.    Chubb's acts and omissions were committed in reckless disregard of Tom's reasonable expectations as an insured under the Policy.

161.    Chubb breached its duty of good faith and fair dealing through the following unreasonable acts, among others:

   a.   Depriving Tom's of the benefits and protections of the Policy;

   b.   Placing its own interests ahead of Tom's, by focusing on the cumulative, macro effect of all policyholders' COVID-19 related claims on Chubb's own balance sheet, rather than the specific facts, state law, and policy language governing Tom's claim;

   c.   Failing to timely pay benefits owed under the Policy;

    d.   Failing to conduct a reasonable and impartial investigation of the loss;

    e.   Forcing Tom's to bring a lawsuit to recover benefits owed and protections

        guaranteed under the Policy;

    f.   Violating the Unfair Claims Settlement Practices Acts of Colorado and/or

        comparable statutes of other states;

    g.   Other conduct to be revealed in discovery.

162.    As a direct and proximate result of Chubb's bad faith breach of its policy, Tom's

has suffered damages and is entitled to damages to be proven at trial.

## COUNT TWELVE – VIOLATION OF C.R.S. § 10-3-1115 AND RELIEF UNDER C.R.S. § 10-3-1116

163.    The allegations set forth above are incorporated by reference as though contained

herein.

164.    Sections 10-3-1115 (1) and (2) of the Colorado Revised Statutes (C.R.S.) prohibit

insurers from unreasonably denying or delaying payment of a claim for benefits owed to or on

behalf of any first party claimant.

165.    Tom's is a first party claimant as that term is used under C.R.S.§ 10-3-

1115(1)(A)(I).

166.    Chubb is an entity engaged in the business of insurance.

167.    Chubb denied payment of first-party benefits owed to Tom's and it did so

unreasonably, and without a reasonable basis, within the meaning of  C.R.S. § 10-3-1115 (1) and

(2), for reasons set forth in this complaint.

168.    Section 10-3-1116(1), C.R.S., provides that a first-party claimant whose claim has

been unreasonably denied or delayed by an insurer may bring an action to recover reasonable

attorneys' fees and court costs and two times the covered benefit (in addition to payment of the benefit itself, totaling three times the benefit amount) that was unreasonably denied or delayed.

169.    As described herein, Chubb's acts and/or omissions violated C.R.S. § 10-3-1115 (1) and (2).

170.    Tom's therefore brings this claim to recover damages awardable under C.R.S. § 10-3-1116, separate and in addition to to those damages and remedies otherwise available.

## Prayer for Relief

WHEREFORE, Tom's respectfully prays for judgment and relief from this Court against Chubb as follows:

a.    For a Declaratory Judgment as outlined in Counts One, Three, Five, Seven, and Nine above;

b.    For all benefits due under the Policy for all covered losses;

c.    For other compensatory damages in amounts to be proven at trial;

d.    For two-times the covered benefit as permitted by C.R.S. § 10-3-1116(1);

e.    For reasonable attorneys' fees, costs, and expenses incurred herein;

f.    For all pre-judgment and post-judgment interest permitted by law;

g.    For such other and further relief as the law permits and the Court deems just and proper.

## Jury Demand

Plaintiffs demand a trial by jury of the maximum number of jurors.

Dated: November 17, 2020.

*s/ Richard D. Milone*               
Richard D. Milone
Milone Law Firm PLLC
The Willard Office Building
1455 Pennsylvania Avenue, NW
Washington, D.C. 20004
Phone:   202.650.5505
Email:    RMilone@milonelawfirm.com

Saskia A. Jordan
Adam Mueller
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone:   303.831.7364
Fax:       303.832.2628
Email:    sjordan@hmflaw.com
              amueller@hmflaw.com

*Attorneys for Plaintiff Tom's Urban Master*
*LLC*