IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-03407-PAB-SKC

TOM'S URBAN MASTER LLC,

     Plaintiff,

v.

FEDERAL INSURANCE COMPANY,

     Defendant.

---

**ORDER**

---

This matter comes before the Court on Defendant Federal Insurance Company's Motion to Dismiss Plaintiff's Complaint [Docket No. 22]. Plaintiff filed a response [Docket No. 31], and defendant filed a reply [Docket No. 38-1].[1] The Court has jurisdiction under 28 U.S.C. § 1332.

**I. BACKGROUND[2]**

Plaintiff brings this case due to defendant's denial of business interruption insurance during the COVID-19 pandemic. Plaintiff owns and operates four sports-themed bars and restaurants in Los Angeles, California; Las Vegas, Nevada; Uncasville, Connecticut; and Ridgefield, Washington. Docket No. 1 at 3-5, ¶¶ 10, 12-

---

[1] Defendant's original reply is Docket No. 37. However, defendant filed a notice of errata explaining that Docket No. 37 did not contain two cited exhibits due to a clerical error and attached a corrected reply and the exhibits in question. Docket No. 38 at 1. Accordingly, the Court considers Docket No. 38-1 to be defendant's reply.

[2] The facts below are taken from plaintiff's complaint, Docket No. 1, and are presumed to be true for purposes of ruling on defendant's motion to dismiss.

15. Each establishment is located within a complex of other businesses. *Id.* The Los Angeles establishment is within the L.A. Live entertainment complex and adjacent to the Staples Center, an indoor arena that is the home court of the Los Angeles Lakers and the Los Angeles Clippers. *Id.* at 4, ¶ 12. The Staples Center is within 1,000 feet of plaintiff's Los Angeles location. *Id.* The Las Vegas establishment is part of the New York, New York hotel casino and complex. *Id.* at ¶ 13. The Connecticut and Washington establishments are located within casino complexes, which have respectively 12,000 and 2,500 seat venues within 1,000 feet of them. *Id.* at 4-5, ¶¶ 14-15.

Sars-CoV-2 is a virus that causes the disease COVID-19 ("COVID-19," the "virus"), which is believed to have spread to humans in or around December 2019. *Id.* at 5, ¶ 16. The pandemic caused by COVID-19, as of November 17, 2020, had infected more than 55 million people worldwide and 11.2 million people in the United States.[3] *Id.* at ¶¶ 18, 20-21. In recognition of the dangers caused by the COVID-19 pandemic, many state and local governments enacted orders suspending operations at locations where people could contract and spread COVID-19. *Id.* at 6, ¶ 27. Each of plaintiff's establishments was subject to at least one civil order issued in mid-March 2020 that required the establishment to close for a period of time due to the COVID-19

---

[3] As of March 27, 2022, these numbers had increased to 480 million worldwide cases and 79 million cases in the United States. *COVID-19 Dashboard*, Johns Hopkins University & Medicine, https://coronavirus.jhu.edu/map.html (last visited Mar. 27, 2022). However, since the filing of the complaint, multiple vaccines have been developed and 559 million vaccine doses have been administered in the United States. *See* Centers for Disease Control and Prevention, *COVID-19 Vaccinations in the United States*, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total (last visited Mar. 27, 2022).

pandemic.  *See id.* at 6-8, ¶¶ 28-31.  As a result of closure, each establishment lost substantial revenue.  *Id.*

Plaintiff purchased insurance policy LLC Policy No. 3604-12-38-WCE (the "policy") from defendant; the policy had a policy term of June 10, 2019 to June 10, 2020.  *Id.* at 8, ¶ 32.  The policy covered each of plaintiff's four establishments and provided protection against loss or damage to covered property.  *Id.*, ¶¶ 33, 35.  It also replaced lost income when business operations were suspended or interrupted because of direct physical loss or damage to a covered property.  *Id.*  The policy provided a blanket limit of $6,014,789 for business income with extra expense and an additional blanket limit of $150,006 for business income "prep of loss" fees, to defray costs and fees of submitting a claim.  *Id.* at 9, ¶ 36.

The coverages relevant to this lawsuit are contained within the section of the policy titled "Business Income with Extra Expense," which is split into two subsections: premises coverages and additional coverages.  *Id.*, ¶ 37.  There are two types of premises coverage: (1) business income loss and extra expense and (2) ingress and egress.  *Id.* at 10-11, ¶¶ 41-47.  There are three types of additional coverage: (1) civil authority, (2) dependent business, and (3) prohibition of access.  *Id.* at 11-15, ¶¶ 48-59.  Each of these coverages, except for prohibition of access, requires that the coverage is triggered by direct physical loss or damage to property.  *See id.*  The premises coverages (business income loss and extra expense and ingress and egress) also provide coverage if the direct physical loss or damage occurs within 1,000 feet of the premises, other than a dependent business premises.  *Id.* at 9, ¶ 38.

On March 16, 2020, plaintiff submitted notice to defendant of its losses. *Id.* at 19, ¶ 80. On June 29, 2020, defendant denied plaintiff's claim because there was not "direct physical loss or damage" to the insured premises or within any of the relevant geographic ranges in the policy. *Id.* at 21, ¶ 87.

The complaint alleges that plaintiff suffered direct physical loss or damage to property because COVID-19 has "been unleashed in and around the premises, rendering the premises unfit and incapable of being used for their intended purpose, and causing multiple civil authorities to order their closure." *Id.* at 17, ¶ 65. The complaint details how COVID-19 can be spread from person to person by respiratory and surface transmission. *See id.* at 17-18, ¶¶ 66-72. Plaintiff describes the confirmed COVID-19 cases of multiple players in the NBA who played at the Staples Center shortly before their diagnoses. *See id.* at 18-19, ¶¶ 74-79.

On November 17, 2020, plaintiff filed its complaint bringing twelve claims against defendant due to the denial of coverage. *See id.* at 21-31, ¶¶ 91-170. On January 29, 2021, defendant filed a motion to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6) due to failure to state a claim. *See* Docket No. 22.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson,* 534 F.3d at 1286 (alteration marks omitted).

## III.  ANALYSIS

The interpretation of an insurance policy is a legal question.[4]  *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002). An insurance policy is a contract, which should be interpreted consistently with the well-settled principles of contractual interpretation. *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990). The words of the contract should be given their plain meaning according to common usage, and strained constructions should be avoided. *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 18 (Colo. 1990). Clauses or phrases should not be viewed in isolation; rather, a policy's meaning must be determined by examining the entire instrument. *Huizar*, 52 P.3d at 819. Policy provisions that are clear and unambiguous should be enforced as written. *Chacon*, 788 P.2d at 750. Where a term in an insurance policy is ambiguous, the Court will construe the term against the drafter and in favor of providing coverage to the insured. *Sachs v. Am. Family Mut. Ins. Co.*, 251 P.3d 543, 546 (Colo. App. 2010). The existence of ambiguity is a question of law, and requires language susceptible of two reasonable

---

[4] The parties agree that Colorado law governs the insurance contract.  *See* Docket No. 22 at 9; Docket No. 31 at 8.

constructions.  *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299

(Colo. 2003); *Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 939 (Colo. 1999).

### A.  Direct Physical Loss or Damage

Counts I-VIII of the complaint bring breach of contract and corresponding

declaratory judgment claims under the four provisions of the policy that require there to

be direct physical loss or damage in order for there to be coverage.  *See* Docket No. 1

at 21-27, ¶¶ 91-142.  Defendant moves to dismiss these claims because COVID-19 and

the civil closure orders did not constitute direct physical loss.  *See* Docket No. 22 at 12.

The principal issue to be decided on Counts I-VIII is whether the presence of

COVID-19 at Tom's locations constitutes "direct physical loss or damage."  In *Western

Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 54 (Colo. 1968), the Littleton

Fire Department closed a church "because of the infiltration of gasoline in the soil under

and around the building, which gasoline and vapors thereof infiltrated and contaminated

the foundation and halls and rooms of the church building, making the same

uninhabitable and making the use of the building dangerous."  The question before the

court was whether the insured suffered a "direct physical loss."  *Id*.  The insurer argued,

*inter alia*, there was no direct physical loss, but rather a loss of use occasioned by the

fire department closing the church.  *Id.* at 54-55.  The court disagreed.  *Id.* at 55.

> It is perhaps quite true that the so-called "loss of use" of the church
> premises, standing alone, does not in and of itself constitute a "direct
> physical loss."  A "loss of use" of course could be occasioned by many
> different causes.  But, in the instant case the so-called "loss of use,"
> occasioned by the action of the Littleton Fire Department, cannot be
> viewed in splendid isolation, but must be viewed in proper context.  When
> thus considered, this particular "loss of use" was simply the consequential
> result of the fact that because of the accumulation of gasoline around and

6

under the church building the premises became so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous.  All of which we hold equates to a direct physical loss within the meaning of that phrase as used by the Company in its Special Extended Coverage Endorsement insuring against "all other risks."

*Id*.  The court went on to state:

Our analysis of the instant case leads us to conclude that there was no direct physical loss sustained on, for example, the first day that gasoline actually seeped onto the insured's premises.  To the contrary, no direct physical loss was incurred by the insured until the [a]ccumulation of gasoline under and around the church [b]uilt up to the point that there was such infiltration and contamination of the foundation, walls and rooms of the church building as to render it uninhabitable and make the continued use thereof dangerous.

*Id*.

Plaintiff argues that *Western Fire* "is the leading case in a nationwide line of authority holding that physical, structural alteration is not needed for circumstances to qualify as 'direct physical loss or damage,' as those words are used in Federal's policy." Docket No. 31 at 11.  Defendant argues that this case is distinguishable from *Western Fire* because (1) plaintiff has not and cannot allege actual infiltration of COVID-19 into its establishments that in turn prompted the closure of the business, and (2), if the Court finds that plaintiff alleged the presence of COVID-19 at the businesses, the presence of the virus is not analogous to the infiltration and saturation of gasoline in *Western Fire* because the virus is dangerous to people, not the physical structure.[5]  Docket No. 22 at 14.

---

[5] In its reply, defendant makes additional arguments to distinguish *Western Fire*: (1) *Western Fire* was an appeal of a jury verdict in which the jury awarded damages to the insured to remediate the premises, and (2) the closure of the church in *Western Fire* was the result of gasoline on that premises as opposed to the state closure order in this case, which were intended to prevent the spread of COVID-19 and not to remediate past infections.  *See* Docket No. 38-1 at 7.

The complaint alleges that NBA players who played at the Staples Center, which is located within 1,000 feet of plaintiff's Los Angeles location, tested positive for COVID-19. *See* Docket No. 1 at 18-19, ¶¶ 74-79. Therefore, the Court finds that plaintiff has sufficiently alleged the presence of COVID-19 within 1,000 feet of at least its Los Angeles location. The Court assumes for the purpose of ruling on defendant's motion to dismiss that plaintiff has also sufficiently alleged the presence of COVID-19 at or within 1,000 feet of its other three locations.

The parties cite a multitude of cases considering similar insurance coverage disputes related to the COVID-19 pandemic, *see, e.g.*, Docket No. 22 at 16 n.6; Docket No. 31 at 18-19; however, there are no decisions from the Colorado Supreme Court or Tenth Circuit interpreting Colorado law on the issue of coverage for COVID-19 business interruptions.

The Court will first look to decisions interpreting *Western Fire* outside of the context of COVID-19, and then consider certain cases cited by the parties in the context of COVID-19. The Court has located only one Tenth Circuit opinion interpreting *Western Fire – Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co.*, 891 F.2d 772, 777-78 (1989). In *Adams-Arapahoe*, the Tenth Circuit affirmed the trial court's decision that expenses incurred after the partial collapse of a roof were direct physical loss. 891 F.2d at 773. After the partial collapse, an inspection revealed corrosion in other portions of the roof that made the continued occupation of the building unsafe and required the replacement of the roof. *Id.* at 774. The Tenth Circuit upheld the trial court's finding that the loss included the entire corroded area because the corrosion

made the building unsafe and unusable, and was not limited to just the portion of the roof that collapsed.  *Id.* at 777.  The Tenth Circuit interpreted *Western Fire* to find that, "[e]ven though there was no physical damage, the Colorado Supreme Court held that the loss of use resulting from the infiltration was a physical loss." *Id.*  The court held that *Western Fire* was controlling and the loss included the entire corroded area.  *Id.* at 777-78.

However, "[a]lthough the issue has not been directly addressed by Colorado state courts, the Tenth Circuit has concluded that economic losses are not 'direct physical loss or damage' to property." *Hasan v. AIG Prop. Cas. Co.*, No. 16-cv-02963-RM-MLC, 2018 WL 10335670, at *3 (D. Colo. Aug. 2, 2018) (quoting *S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1142 (10th Cir. 2004)).

Plaintiff alleges that COVID-19 can be spread by surface transmission.  *See* Docket No. 1 at 17-18, ¶¶ 66-67, 71-72.  Assuming this somewhat dubious proposition is true, plaintiff argues that the building itself could become a vector for transmission. However, the danger caused by the virus is to people, not to the building.  The Court finds that *Western Fire* supports a conclusion that direct physical loss must be caused by some physical alteration to the building or physical peril that makes entering the building dangerous in order for there to be a direct physical loss.  *See Western Fire*, 437 P.2d at 55 ("[N]o direct physical loss was incurred by the insured until the [a]ccumulation of gasoline under and around the church [b]uilt up to the point that there was such infiltration and contamination of the foundation, walls and rooms of the church building as to render it uninhabitable and make the continued use thereof dangerous.").

This conclusion is supported by the Tenth Circuit's decision in *Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704, 710-11 (10th Cir. 2021), interpreting the term "direct physical loss" under Oklahoma law.  The insurance policy did not define the term, and the Oklahoma Supreme Court has not construed it; accordingly, the Tenth Circuit looked to the dictionary definition.  *Id.* at 710.  The court determined that a "'direct physical loss' requires an immediate and perceptible destruction or deprivation of property."  *Id.*  The court rejected the plaintiff's argument that direct physical loss could encompass intangible loss and/or property rendered unusable for its intended purpose.  *Id.*  The court noted that "'intangible' and 'physical' have opposite meanings." *Id.*  In *MNR LLC v. Ohio Sec. Ins. Co.*, 2022 WL 444103, at *5 (D. Kan. Feb. 14, 2022), the court, construing an insurance policy under Colorado law, found that *Western Fire*'s construction of direct physical loss "is entirely consistent with the Tenth Circuit's conclusion in *Goodwill*."  While the Court recognizes that *Goodwill* construed direct physical loss in the absence of an Oklahoma Supreme Court case, the Court finds that *Goodwill* supports the proposition that direct physical loss requires some alteration of the property.

In *Biltrite Furniture, Inc. v. Ohio Sec. Ins. Co.*, 2021 WL 3056191, at *4 n.4 (E.D. Wis. July 20, 2021), the court distinguished *Western Fire* and two other cases that plaintiff cites here[6] on the grounds that each of the cited cases "deals with a physical

---

[6] These cases are *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2014 WL 6675934, at *5-6 (D.N.J. Nov. 25, 2014), and *Or. Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, 2016 WL 3267247, at *4-5 (D. Or. June 7, 2016), *vacated*, 2017 WL 1034203 (D. Or. Mar. 6, 2017).  *See* Docket No. 31 at 11.

peril that made entering a structure hazardous."  The Court agrees with this distinction.[7]
*See also Sagome, Inc. v. Cincinnati Ins. Co.*, 2021 WL 4291016, at *2 (D. Colo. Sept. 21, 2021) (finding *Western Fire* and *Adams-Arapahoe* "easily distinguishable because they involved contamination by a physical substance or alteration of the structure of the building insured").

Plaintiff asserts that the court in *Western Fire* found that the closure by the fire department was sufficient to constitute direct physical loss.  *See* Docket No. 31 at 11.  The Court rejects this interpretation.  Instead, the *Western Fire* court noted that because the "accumulation of gasoline around and under the church building the premises became so infiltrated and saturated as to be uninhabitable, [it] ma[de] further use of the building highly dangerous."  437 P.2d at 55.  The court held that the infiltration and accumulation, together with the danger to persons from continued use, is what constituted a direct physical loss.  *Id.  Western Fire* thus differs from the present case in that the physical loss in *Western Fire* was caused by the infiltration and saturation of a substance that caused danger to persons entering the structure, whereas COVID-19 does not "involve[] contamination by a physical substance or

---

[7] Plaintiff also cites  *Essex Ins. Co. v. BloomSouth Flooring Corp*., 562 F.3d 399, 406 (1st Cir. 2009) ("[A]llegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to the property has been claimed."), and *Mellin v. N. Sec. Ins. Co*., 115 A.3d 799, 805 (N.H. 2015) ("[W]e hold that physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage.  These changes, however, must be distinct and demonstrable.").  Docket No. 31 at 11.  The Court finds *Essex* distinguishable on the grounds that it was the odor, and not a government closure, that caused the loss of use.  Similarly, in *Mellin*, the basis of the holding concerned odors, whereas COVID-19 does not cause an alteration to the property.  *See Mellin*, 115 A.3d at 805 ("'[P]hysical loss' requires a distinct and demonstrable alteration of the insured property.").

alteration of the structure of the building insured." *See Sagome*, 2021 WL 4291016, at

*2 (distinguishing *Western Fire* on this basis); *see also Biltrite*, 2021 WL 3056191, at *4

n.4 (distinguishing the danger in *Western Fire* from the danger presented by COVID-19

on the basis that *Western Fire* "deals with a physical peril that made entering a

structure hazardous."). Accordingly, the Court rejects plaintiff's argument that *Western*

*Fire* requires a finding that plaintiff here suffered a direct physical loss.[8]

  The Court finds the analysis from *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, 535 F.

Supp. 3d 152 (W.D.N.Y. Apr. 23, 2021), *affirmed by Kim-Chee LLC v. Phila. Indem. Ins.*

*Co.*, 2022 WL 258569 (2d Cir. Jan. 28, 2022) (unpublished), helpful. In *Kim-Chee*, the

court considered whether the closure of the plaintiffs' business due to the COVID-19

pandemic was caused by direct physical loss or damage to the insured property. 535

F. Supp. 3d at 157.

> [T]he court identifies two complementary principles. First, since the
> *Western Fire Insurance* case, courts have consistently ruled that
> contamination by a persistent chemical or biological agent, not otherwise
> excluded from coverage, may cause a direct physical loss if it renders the
> insured property unusable. This principle applies even though the
> contamination may be gaseous, microscopic, or invisible. Covered losses
> are not confined to the obvious physical changes to a building caused by
> fire or bad weather.
>
> Second, contamination that is temporary, like the road dust in the *Mama*
> *Jo's[, Inc. v. Sparta Ins. Co.*, 823 F. App'x 868 (11th Cir. 2020),] decision,
> or that imposes remediation costs without preventing use of the building,
> like the asbestos in *Yale University v. Cigna Insurance Co.*, [224 F. Supp.
> 2d 402 (D. Conn. 2002),] is unlikely to qualify as a direct physical loss to
> the insured premises. This does not mean that the contamination is not

---

[8] Plaintiff submitted supplemental authority in the form of an order from the
Boulder County District Court denying an insurance company's motion for judgment on
the pleadings with regard to whether COVID-19 qualified as a "physical loss or damage"
under the policy. *See* Docket No. 46-1 at 5. The Court will not follow that court's
reasoning.

> expensive to remove or serious in its health risks.  Rather, courts have recognized that first-party coverage responds to physical damage to the insured property and not to all forms of loss or expense experienced by the property owner.

*Id.* at 161.  The court went on to find that, in the absence of plausible allegations that the virus persists within insured premises in the manner of gasoline or other contaminants, the loss suffered by the plaintiff was not a direct physical loss or damage to the building.  *Id*.  On appeal, the Second Circuit "agree[d] with the district court that the virus's inability to physically alter or persistently contaminate property differentiates it from radiation, chemical dust, gas, asbestos, and other contaminants whose presence could trigger coverage under Kim-Chee's policy."  *Kim-Chee*, 2022 WL 258569, at *2.

Plaintiff principally relies on *Cherokee Nation v. Lexington Ins. Co.*, 2021 WL 506271 (Okla. Dist. Ct. Jan. 28, 2021), where the court found that government closures due to COVID-19 constituted "direct physical loss" and granted summary judgment in favor of the insured.  *Id.* at *5, *12.  The Court disagrees with *Cherokee Nation*.  *See Goodwill*, 21 F.4th at 710-11 ("[A] 'direct physical loss' requires an immediate and perceptible destruction or deprivation of property."; "Goodwill's temporary inability to use its property for its intended purpose was not a 'direct physical loss.'"); *Till Metro Ent. v. Covington Specialty Ins. Co.*, 545 F. Supp. 3d 1153, 1162 (N.D. Okla. 2021) (finding that under Oklahoma law and the relevant policy, "'direct physical loss' unambiguously means property must be materially lost, *i.e*., the insured suffers a permanent dispossession of the property, or damaged to trigger coverage.").[9]

_____

[9] The court in *Cherokee Nation* distinguished *Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 499 F. Supp. 1098 (W.D. Okla. 2020), because "[s]imply put,

The Court first notes that *Cherokee Nation* applied Oklahoma law.  In *Cherokee Nation*, the court interpreted *Western Fire* to stand for the proposition that direct physical loss includes circumstances where the property is rendered unusable for its intended purpose.  *Id.* at *5.  By contrast, the Court interprets *Western Fire* to require some physical alteration to the building or physical peril that makes entering the building dangerous in order for there to be a direct physical loss.  Accordingly, the Court rejects the *Cherokee Nation* court's interpretation of *Western Fire*.  Plaintiff also cites *Cherokee Nation* for the proposition that requiring tangible, structural alteration of the property in order to find direct physical loss makes "loss" redundant of "damage."  Docket No. 31 at 16-17.  However, this is not what the Court's construction of direct physical loss requires.  Finding a direct physical loss to a building to be a change to or risk of physical peril to the property does not render "loss" redundant of "damage."  *See Goodwill,* 21 F.4th at 711 ("The phrase 'loss of' refers to dispossession of property—for example, via theft—and therefore has a different meaning from the term 'damage to.'"); *Till Metro*, 545 F. Supp. 3d at 1161-62 (rejecting argument that in order for direct physical loss and direct physical damage to mean different things, loss reasonably includes the loss of the full range of rights of physically using the property).

Plaintiff attempts to distinguish its insurance policy from those where courts have found that COVID-19 is not a direct physical loss on three main bases: (1) the insured property is defined to include a 1,000 foot radius for determining whether there is "loss or damage" to insured property; (2) there are known instances of COVID-19 within the

the policy language is not the same."  2021 WL 506271, at *8.

insured property and/or the 1,000 foot radius; and (3) plaintiff's policy has no virus exclusion.  Docket No. 31 at 2-3.  The Court finds each argument unpersuasive.

Plaintiff argues that the 1,000 foot extension "is a fundamental differentiator between the policy that Federal sold to Tom's and other policies in the marketplace." *Id.* at 22.  Therefore, according to plaintiff, if a hurricane or fire damaged the area around plaintiff's property and plaintiff lost business, that lost business income would be covered.  *Id.*  However, plaintiff has not provided any evidence of a direct physical loss to either its restaurants or any of the buildings within 1,000 feet.  The 1,000 foot radius allows a larger area that may suffer direct physical losses, but the larger radius does not change the Court's conclusion that no direct physical loss has occurred.  This reasoning also applies to the lack of a virus exclusion in the policy.  *See Kim-Chee*, 535 F. Supp. 3d at 162-63 (finding that because the policy was unambiguous, the absence of a virus exclusion did not alter the limits that direct physical loss clause placed on coverage); *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191, 1201 n. 61 (D. Kan. 2020) ("The fact that Defendant chose not to include a virus exclusion in the Policy does not render it ambiguous.  And if there is no coverage, there is no reason to consider whether an exclusion applies." (internal citation omitted)). Finally, as noted earlier, the Court assumes that COVID-19 existed at plaintiff's premises.  Therefore, none of the reasons provided by plaintiff warrant a different result.

Accordingly, the Court finds that plaintiff did not suffer a direct physical loss or damage.  Because a direct physical loss or damage is a predicate to coverage, and without coverage there can be no breach of contract, the Court will grant defendant's

motion to dismiss Count II (breach of contract: business income), Count IV (breach of contract: ingress and egress), Count VI (breach of contract: civil authority), and Count VIII (breach of contract: dependent business premises). Each of these counts has a corresponding claim for declaratory judgment. *See* Docket No. 1 at 21-27, ¶¶ 91-142. Because the Court will dismiss plaintiff's breach of contract claims, the Court will also dismiss plaintiff's Count I, Count III, Count V, and Count VII for declaratory judgment. *See Cafe Plaza de Mesilla Inc v. Cont. Cas. Co*., 519 F. Supp. 3d 1006, 1016 (D.N.M. 2021) (dismissing declaratory judgment claims as duplicative of breach of contract claims because "rul[ing] against Plaintiff on its breach of contract claims[] necessarily resolv[ed] all issues identified in Plaintiff's declaratory judgment claims."). Accordingly, the Court will grant defendant's motion to dismiss Counts I-VIII.

### B.  Prohibition of Access

Count IX is a declaratory judgment claim for prohibition of access, and Count X is a breach of contract claim for prohibition of access. *See* Docket No. 1 at 27-28, ¶¶ 143-55. The prohibition of access provision of the policy provides coverage for business income loss and extra expense "due to the actual impairment of your operations, directly caused by the prohibition of access to a premises shown in the Declarations by a civil authority, subject to the applicable Limits of Insurance for Prohibition of Access." *Id.* at 15, ¶ 59. This coverage does not apply if the prohibition of access is caused by or results from direct physical loss or damage to property. *Id.* Defendant argues that the civil orders referenced in the complaint do not specifically prohibit access to any of plaintiff's establishments, but instead merely restricted the way

plaintiff could do business.  Docket No. 22 at 22.  Defendant also cites cases in support of the proposition that access to plaintiff's establishments was not "prohibited" within the meaning of the policy.  *Id.* at 22-23.

Plaintiff's only response to this argument is that the prohibition of access claims are pled in the alternative and, "[i]f Tom's is ultimately unable to prove 'direct physical loss or damage to property' on summary judgment or at trial, then Federal will owe coverage under Prohibition of Access coverage."  Docket No. 31 at 23-24.  Plaintiff fails to support this statement with an argument.  "[I]t is not this court's duty . . . to make arguments for a litigant that he has not made for himself."  *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) (unpublished); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that the court has no obligation to make arguments or perform research on behalf of litigants).  Plaintiff presents no argument why defendant's interpretation is not correct, and the Court will grant defendant's motion to dismiss Count X (breach of contract: prohibition of access).  *See E&I Holdings Inc. v. Coral Springs Eggs and I, LLC*, No. 17-cv-02377-WJM-STV, 2018 WL 4680339, at *5 (D. Colo. Sept. 28, 2021) ("Given Defendants' failure to respond to the argument altogether, however, the Court deems that portion of the motion confessed.").  Count IX is a declaratory judgment claim based on prohibition of access.  *See* Docket No. 1 at 27-28, ¶¶ 143-48.  The Court accordingly will deny it for the same reasons given above with respect to the other declaratory judgment claims.

### C.  Common Law and Statutory Bad Faith

Defendant argues that Counts XI and XII, common law and statutory bad faith breach of an insurance contract due to failure to pay benefits, must be dismissed because there can be no bad faith where there is no coverage.  *See* Docket No. 22 at 23-25.  The Court agrees.  Given that the Court will dismiss Counts I-X, the Court will also dismiss the common law and statutory bad faith claims.  S*ee MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1193 (10th Cir. 2009) ("It is settled law in Colorado that a bad faith claim must fail if, as is the case here, coverage was properly denied and the plaintiff's only claimed damages flowed from the denial of coverage."); *Am. Family Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 117 (Colo. 2016) ("American Family's denial of Hansen's claim in reliance on the unambiguous insurance contract was reasonable, and American Family cannot be held liable under sections 10-3-1115 and -1116 for statutory bad faith."); *see also Markel Ins. Co. v. Hollandsworth*, 400 F. Supp. 3d 1155, 1160 (D. Colo. 2019) ("Given the Court's conclusion that [defendant] is not entitled to coverage as a matter of law, [defendant's] counterclaims—namely, breach of contract and statutory bad faith of insurance contract—also fail as a matter of law.").

### IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Federal Insurance Company's Motion to Dismiss Plaintiff's Complaint [Docket No. 22] is **GRANTED**.  It is further

**ORDERED** that plaintiff's complaint is **DISMISSED with prejudice**.  It is further

**ORDERED** that this case is closed.

DATED March 31, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge